### In re GRAFF et al.

(District Court, E. D. New York. July 24, 1902.)

1. BANKRUPTCY—TRUST FUNDS—RECOVERY BY OWNER.

Bankrupts, who were brokers, a short time before their bankruptcy purchased certain stocks for a customer, through another firm, which were fully paid for by the customer by money to his credit with bankrupts. The firm through which the purchase was made retained the stocks, and subsequently sold the same, with other stocks purchased for the bankrupts, and from the proceeds paid an indebtedness from the bankrupts to them, leaving a balance in their hands. *Held* that, as against the bankrupts and their general creditors, whose rights were no greater, the presumption was that the proceeds of the customer's stocks were in such balance, and that he was entitled to recover the same.

2. SAME—BROKERS—STOCKS PURCHASED FOR CUSTOMER.

The bankrupts purchased other stock for the same customer, which had been paid for, but not delivered. At the time of the bankruptcy the bankrupts held a larger quantity of such stock, some of which had been pledged, and some of which came into the hands of the trustee, who sold the same. *Held*, that the presumption was that a part of the stock on hand was held for the customer, and that he was entitled to the proceeds received therefor by the trustee.

3. SAME—CONVERSION OF STOCKS BY BROKER—ADJUSTMENT OF CLAIM.

A broker purchased stock for a customer, and charged the same to his account. On the same day the customer drew out a sum from his account, which left a balance to his credit less than the cost of the stock. Between that time and the broker's bankruptcy the customer had increased his credit, and also some time between the two dates the broker converted the stock, and the customer filed a claim for its value. *Held*, that he was entitled to credit as a payment on the stock for his credit balance at the close of the day on which the purchase was made, together with the subsequent increase in such credit; also that the sum withdrawn on that day was not chargeable to him as a preference, it not appearing whether it was withdrawn before or after the stock was purchased, and the presumption being that it was in either case prior to the accrual of his claim for conversion.

4. SAME.

Where a bankrupt converted certain stock purchased by him as a broker some time between the time of its purchase and his bankruptcy, the exact time not appearing, the value of the stock, for the purpose of measuring the owner's damages, may properly be taken as of the date when the petition in bankruptcy was filed.

5. SAME—PREFERENCES.

At the. time of the making of a general assignment by a firm of brokers, and shortly prior to their bankruptcy, their bookkeeper had a credit upon their books, and also a claim against them for certain stock owned by him, which it appeared they had previously converted. On that date he received payment of the balance due him on the book account. *Held* that, as his claim growing out of the stock transaction was at that time one for damages only, the payment received was a preference, which he must surrender before proving such claim.

In Bankruptcy. On review of referee's decision respecting certain claims.

Welton G. Percy, for trustee.
J. Edw. Swanstrom, for Maxwell.
Cameron & Hill, for Reilly.
A. J. Koehler, for Kreinbrink and Franklin.
G. E. Waldo, for Mosscrop.

### In re Claim of Maxwell.

THOMAS, District Judge. G. Edward Graff & Co., brokers, made a general assignment for the benefit of creditors on May 16, 1901, and a petition in bankruptcy was filed against them on the following 21st day of May. Graff & Co., through Adams, McNeil & Brigham, bought for Maxwell the following stock: May 7th, 100 shares Southern Pacific; May 15th, 20 shares U. S. Steel preferred; and May 1st, 200 shares Bay State Gas (not purchased through Adams, McNeil & Brigham). For all these stocks full payment was made at the time of ordering by moneys to the purchasers' credit. Keeping in mind the conceded fact that Graff bought for Maxwell the Southern Pacific and the U. S. Steel, through Adams, McNeil & Brigham, the first conclusion is reached' that Adams, McNeil & Brigham held the shares specifically bought for Maxwell. What became of these stocks? Between the time of their purchase and May 27th, Adams, McNeil & Brigham sold the stocks bought through them, and other stocks, to meet certain indebtedness of Graff, and there was a general balance therefrom of $27,791.77. Therefore the proceeds of Maxwell's stock are either in this balance, or were appropriated by Adams, McNeil & Brigham to pay Graff's debt to them. If, now, the question were whether Maxwell should be preferred to Graff in the distribution of this surplus, the state of fact would be that Graff had authorized Adams, McNeil & Brigham to sell Graff's stock and Maxwell's stock to pay Graff's debt, and there would be no doubt that Maxwell should be paid first from the fund. But Graff's general creditors, through the proceedings in bankruptcy, claim the fund to the exclusion of Maxwell. This is not a case where the creditors have a better title than the debtor. Maxwell's money is all in the fund, or, as between Maxwell and Graff, it should be all in the fund, for Graff had no right to authorize Adams, McNeil & Brigham to sell Maxwell's stock in priority to Graff's own stock. What Graff's right would be the creditors' rights now are. The statement of facts shows that no other customer of Graff was long on either of such stocks at the time of the failure, but adds, "except customers who owed a debit balance to the firm against stocks bought for them." But no such marginal purchasers are before the court, nor do such persons make any claim upon the fund. Regarding alone the parties who demand the fund, viz., Maxwell and the general creditors, Maxwell has priority. But it may be urged that the proceeds of Maxwell's stock cannot be traced to the balance. The question is not directly whether it can be traced to the balance, but can it be traced to the moneys in Adams, McNeil & Brigham's hands from which the balance arose. Adams, McNeil & Brigham closed out the last Southern Pacific held by them for Graff on May 10th, but continued to sell other nonenumerated securities in which Graff had an interest until the 16th day of May. Thereafter no securities were

sold until the 27th day of May, when the remainder of the securities held by them for the account of George Steele, in whose name Graff & Co. acted, were sold, and the balance above stated remained. From the 10th day of May to the 27th, the only stock purchased for the account of George Steele was as follows:

| | | |
|---|---|---:|
| May 15. | 30 Atchison preferred, 96½, value, less commissions...... | $2,887 50 |
| " " | 21 U. S. Steel preferred, 92½, value, plus commissions.... | 1,945 13 |
| " " | 15 Linseed Oil, 19½ delivered, value, less commissions.... | 981 25 |
| " 16. | 10 Southern Railway preferred, at 60, value, plus commissions......... | 801 25 |
| " " | 20 U. S. Steel preferred, at 90, value, plus commissions... | 1,802 50 |
| | Total........ | $8,417 63 |
| | Deduct 15 Linseed Oil delivered....................... | 981 25 |
| | Balance...... | $7,436 38 |

This includes Maxwell's U. S. Steel preferred.

The evidence does not show the securities, nor the value thereof, sold after May 10th; nor is there any evidence before the court showing how the account stood between Graff and Adams, McNeil & Brigham at any time, save after the sale on the 27th. The presumption is quite as strong that the balance remaining on the 27th contains the proceeds of the sale of the stock of Maxwell as that it is made up wholly of the proceeds of the sale of Graff's stock. The amount added to it after May 10th was only $7,436.38, as above stated. Hence the fund was not created after May 10th, except to that extent, and to the extent that securities were sold after May 10th and before May 27th, which account is not stated. Adams, McNeil & Brigham were selling Maxwell's stock just as really as they were selling Graff's shares. Why presume that the fund belonged to Graff & Co., the offenders, and place the burden of distinguishing upon Maxwell? Why call the fund Graff's, and not Maxwell's, to the extent of the latter's interest?

It is considered that the fund remaining with Adams, McNeil & Brigham on May 27th, from which the balance of $27,791.77 arises, contains the proceeds of the sale of the Southern Pacific sold on the 10th, and the U. S. Steel preferred bought on the 15th and sold on the 27th. On May 15th Graff & Co. wrote to Maxwell as follows:

"We inclose herewith notice of purchase of 20 shs. of U. S. Steel Pfd. stock at 90. Will have the stock transferred to your name; also the 100 shs. of So. Pac. which you are long of."

There were no sales of the U. S. Steel preferred until the 27th; therefore, of necessity, the proceeds of its sale were in the amount from which the above-named balance arises. At the time of the failure Graff & Co. had 1,300 shares of Bay State Gas in their office, which was sold by the trustee on December 4, 1901; and 2,100 shares pledged were sold by the pledgee June 19, 1901. It was the duty of Graff & Co. to have 200 shares of the stock on hand for delivery to Maxwell, and presumptively a part of the 1,300 shares were held for that purpose. The presumption is that Graff & Co. did not, by sale or pledge, convert the stock, but rather had it on hand. If it was on hand, it was sold by the receiver, who should return to Maxwell the proceeds

thereof. All the computations employed by the referee with respect to the amounts will be adopted, and Maxwell will be preferred to the amounts found. It is understood that no interest will be allowed, except such interest as the money returned shall have earned during the time that the proceeds of the stock have been in the hands of the receiver or trustee.

### In re Claim of Reilly.

The disposition of the Maxwell claim leads to a confirmation of the referee's disposition of the Reilly claim. The claim is against the estate for a conversion of stock by Graff & Co. They did not convert the stock after the petition was filed in this court; therefore a valuation after that time cannot be adopted.

### In re Claim of Kreinbrink.

Kreinbrink was a customer of Graff & Co. So far as appears, the account was opened on March 20, 1901. On April 2d, Graff & Co. purchased for Kreinbrink 100 shares of Republic Steel and Iron, at the sum of $2,212.50, less commissions. The only payment made towards this stock was such cash balance as Kreinbrink had on hand on the day that it was purchased and thereafter maintained or increased. At the close of the business day on April 2d, Kreinbrink's balance appears to have been $981.55, which left him in debt for the stock at the close of business on that day to the amount of $1,230.95. Hence, considering the transaction of April 2d, it is concluded that Kreinbrink paid in $981.55 for the stock and was owing $1,230.95. The referee valued the stock, as of the filing of the petition in bankruptcy, at $1,875, and, deducting the amount owing on the stock, it would leave as due the claimant $644.05. But it appears that after the day mentioned, and to and including May 17th, Kreinbrink's credit increased, so that on the last-named day the balance against him was only $993.64. The referee has allowed this amount as the payment actually made upon the stock claimed to have been converted. In this he was sufficiently liberal to claimant, but by pursuing such a course it is easily conceivable that he should regard the $84.72 drawn out on April 2d as a preference, and so, indeed, it might be, if the account is to be simply regarded as an account current between the parties. But in fact the claim is for the conversion of stock some time between April 2d and the time of bankruptcy. The amount paid in on the stock was the amount of Kreinbrink's account at the close of business on April 2d, after charging him with the check for $84.72 drawn on that day. There is no evidence that he drew the amount after the stock was charged to him. He may have drawn it before. Nor is there the slightest evidence that he drew it after the conversion. Unless he drew it after the cause of action arose, there could be no possible preference. The stock was bought on April 2d, and there is no evidence that it was converted on that date. The presumption is that it was not. Therefore the check was drawn before the cause of action arose. Hence Kreinbrink is entitled to the amount allowed him by the referee, without returning the $84.72. The claimant contends that the damages may be based upon the value of the stock on April 2d. There is no evidence of conversion on that day, but the evidence shows that the

stock was charged to him on that day, which would be an indication that at that time conversion had not taken place. The claimant asks for no other measure of damages. The trustee claims that it should be at the time of the general assignment. The referee adopts neither rule, but adopts the value at the time the petition was filed. It is believed that the time urged by the claimant is incorrect; that the date suggested by the trustee does not exclude the right of the referee to adopt the date when this court took jurisdiction in the matter; and, if the relation of a broker to his customer be that stated by the court in Re Gaylord (D. C.) 113 Fed. 131, then such decision fully supports the referee's decision.

### In re Claim of Franklin.

Franklin was the bookkeeper for the bankrupts at their Brooklyn office, and on May 16, 1901,—the time of the general assignment,—he was long 10 shares U. S. Steel Company's stock on the books of the bankrupts, with whom he had two accounts, both showing a cash balance in the claimant's favor,—one for $15.16, and the other for $740. On May 16th, at about noon time, Franklin received for the balance of his two accounts Graff & Co's check, which he immediately procured to be cashed. He has filed a claim either for the return of the stock or for conversion thereof, placing the value of the stock at $523.75. The trial before the referee proceeded upon the theory that there was a conversion of the stock, and that its value as of the 21st of May, when the petition in bankruptcy was filed, was $432.50; and it was further held by the referee that the amount received by the bankrupts on the 16th of May, as above stated, was a preference, and must be returned, before the claim for the stock could be allowed. Upon the record is found the following stipulation:

"It is conceded that the number of the 10 share certificate of U. S. Steel Co. stock into which the witness' (claimant's) Steel and Wire was transferred was 17685A."

If there is any competent evidence that the firm of Graff & Co. had the stock at the time that it made its general assignment, or the petition in bankruptcy was filed, or that the stock came into the hands of the receiver or trustee, the court has been unable to discover it. Therefore the claim, if any, must be to recover the value thereof. Hence, before the money was withdrawn by the claimant, he had simply claims for damages against Graff & Co. and for the money shown by his account. Under such states of facts he certainly received a preference when he withdrew the money. Claimant's counsel insists that the conversion was on June 3, 1901. Certainly the stock could not be valued at a later time than the filing of the petition in bankruptcy, and the rule pursued by the referee in that regard is correct, as is his finding that the money withdrawn must be returned before the claim can be filed.

### In re Claim of Mosscrop.

The conclusion reached by the referee in this matter is affirmed. The views heretofore expressed in this memorandum sufficiently account for the attitude of the court towards this claim.